BOARD OF GOVERNORS
OF THE
FEDERAL RESERVE SYSTEM
WASHINGTON, D. C. 20551

ADDRESS OFFICIAL CORRESPONDENCE
TO THE BOARD

September 20, 2022

Christopher M. Wolpert
Clerk, United States Court of Appeals for the Tenth Circuit
Byron White U.S. Courthouse
1823 Stout Street
Denver, CO 80257

Re:   *Frank E. Smith and Mark A. Kiolbasa v. Board of Governors of the Federal Reserve System*, No. 21-9538

Dear Mr. Wolpert:

We write pursuant to Federal Rule of Appellate Procedure 28(j) to provide notice of the recent decision by a panel of this Court in *Integrity Advance LLC v. CFPB*, No. 21-9521, ___ F.4th ___, 2022 WL 4241846 (10th Cir. Sept. 15, 2022) (opinion attached). This decision supports the Board's position that, even if the Court were to reach Petitioners' constitutional argument concerning purported removal protections,[1] no relief from the challenged agency action would be available.

In *Integrity Advance*, the Consumer Financial Protection Bureau ("Bureau") had initiated proceedings against the petitioners in 2015, while its Director enjoyed removal protections that were subsequently held unconstitutional. *Integrity Advance*, 2022 WL 4241846, at *2-3. The *Integrity Advance* petitioners argued that the Bureau therefore lacked authority to act when it initiated the proceeding and the proceeding must be set aside. *Id.* at *5.

The panel rejected these arguments. It held that, under *Collins v. Yellen*, 141 S. Ct. 1761 (2021), the validity of removal protections does not impact the validity of agency action where the officer was properly appointed. *Id.* at *6 (citing *Collins*, 141 S. Ct. at 1787-88; *CFPB v. CashCall*, 35 F.4th 734, 742 (9th Cir. 2022)). Consequently, to obtain relief from agency action based on removal protections, petitioners must "point to . . . 'compensable harm'" resulting from the protections, such as that arising from an attempt to remove the official who took the action that was thwarted by these protections. *Id.* Because the petitioners had failed to do so, the Court found "no avenue of relief available to them under *Collins*." *Id.*

As such, pursuant to controlling precedent, Petitioners could not obtain any relief because the presiding official was properly appointed, Bd. Br. Ex. 2, and Petitioners have failed to

---

[1] As noted in our brief, the Court has no need to reach this argument because it was not properly exhausted and there was in any event no applicable removal protection or constitutional violation. Board Br. at 14-32.

identify any cognizable "compensable harm" resulting from the purported removal protections they challenge.

                    Respectfully Submitted,

                    /s/ Yonatan Gelblum
                    Yonatan Gelblum

                    *Attorney for Respondent Board of Governors of the Federal Reserve System*

2022 WL 4241846
Only the Westlaw citation is currently available.
United States Court of Appeals, Tenth Circuit.

INTEGRITY ADVANCE, LLC;
James R. Carnes, Petitioners,

v.

CONSUMER FINANCIAL
PROTECTION BUREAU, Respondent.

No. 21-9521
|
FILED September 15, 2022

**Synopsis**
**Background:** Payday lender and its chief executive officer (CEO) appealed final decision of Director of Consumer Financial Protection Bureau in enforcement action, in which Director adopted recommendations of Christine Kirby, ALJ, as to lender's and CEO's liability for violations of Consumer Financial Protection Act (CFPA), the Truth in Lending Act (TILA), and the Electronic Fund Transfer Act (EFTA), imposed restitution award and civil penalties, and ratified notice of charges.

**Holdings:** The Court of Appeals, Phillips, Circuit Judge, held that:

fact that Bureau was unconstitutionally structured at time notice of charges was filed did not require enforcement action to be set aside as void;

constitutionally appointed ALJ did not err in conducting de novo review of existing record rather than new hearing with additional evidence and argument;

ALJ acted within her discretion in foregoing live testimony;

three-year limitations period commenced for filing notice of charges against CEO when Bureau received lender's responses to civil investigative demands and deposed CEO;

Bureau did not err in finding that CEO knew about lender's misrepresentations to customers, supporting CEO's liability under CFPA;

lender's practice of using remotely created paper checks to withdraw funds from customer bank accounts was unfair practice under CFPA; and

lender and CEO were not entitled to offset for legitimate business expenses from legal restitution order.

Affirmed.

Phillips, Circuit Judge, filed concurring opinion.

**Petition for Review of an Order from the Consumer Financial Protection Bureau (Consumer No. 2015-CFPB-0029)**

**Attorneys and Law Firms**

Richard J. Zack (Michael A. Schwartz and Christen M. Tuttle, with him on the brief), of Troutman Pepper Hamilton Sanders LLP, Philadelphia, Pennsylvania, for Petitioners.

Lawrence DeMille-Wagman, Senior Litigation Associate (Stephen Van Meter, Acting General Counsel; Steven Y. Bressler, Acting Deputing General Counsel; and Kevin E. Friedl, Senior Litigation Counsel; Consumer Financial Protection Bureau, with him on the brief) Washington D.C., for Respondent.

Before TYMKOVICH, Chief Judge, PHILLIPS, and McHUGH, Circuit Judges.

**Opinion**

PHILLIPS, Circuit Judge.

**\*1** Integrity Advance, LLC operated as a nationwide payday lender offering short-term consumer loans at high interest rates. In 2015, the Consumer Financial Protection Bureau ("Bureau") brought an administrative enforcement action against Integrity and its CEO, James Carnes (collectively, "Petitioners"). The Notice of Charges alleged violations of the Consumer Financial Protection Act ("CFPA"), the Truth in Lending Act ("TILA"), and the Electronic Fund Transfer Act ("EFTA").

Between 2018 and 2021, the Supreme Court issued four decisions—*Lucia v. SEC*, *Seila Law v. CFPB*, *Liu v. SEC*, and *Collins v. Yellen*—that bore on the Bureau's enforcement activity in this case. These opinions decided fundamental

issues such as the Bureau's constitutional authority to act and the appointment of its administrative law judges ("ALJ"). The series of decisions led to intermittent delays and restarts in the Bureau's case against Petitioners. For instance, two different ALJs decided the present case years apart, with their recommendations separately appealed to the Bureau's Director. Ultimately, the Director mostly affirmed the recommendations of the second ALJ.

Petitioners have appealed the Director's final order to our court under 12 U.S.C. § 5563(b)(4). They ask that we vacate the order, or at least remand for a new hearing, mainly arguing that the Director's order didn't give them the full benefit of the Supreme Court's rulings. For the reasons below, we reject Petitioners' various challenges and affirm the Director's order.

## BACKGROUND

### I. Factual Background

From 2008 to 2013, Integrity operated nationwide as a payday lender. It was founded and run by James Carnes, its CEO.[1] The company offered short-term, small-dollar consumer loans at high interest rates. Integrity's loans usually ranged from $100 to $1,000 and were its only financial product. Though the law usually allows for non-coercive contractual arrangements between private parties, it sometimes requires heightened disclosure for loan agreements between parties of disparate bargaining power.

[1] Integrity was owned by Hayfield Investment Partners. Carnes was technically employed by Hayfield. The Bureau tells us that Carnes called himself Integrity's "de facto" CEO because Integrity had no employees of its own. Resp. Br. at 4 n.4.

As relevant here, TILA requires loan providers to disclose material terms about the structure of their offered loans. Though Integrity provided borrowers TILA disclosure documents, it misled borrowers about the loan structure. Its disclosure documents misleadingly implied that the loans were single-payment loans. In fact, the loans typically resulted in multi-payment installment loans that automatically renewed. So absent undoing the automatic renewal, borrowers were left paying more in fees than Integrity had disclosed.

In January 2012, the Bureau and the Federal Trade Commission ("FTC") entered a Memorandum of Understanding by which the two agencies agreed to share information about their enforcement activities and any consumer complaints received. In March 2012, the Bureau searched the FTC database for consumer complaints about Integrity. The search returned complaints revealing consumer confusion about the true cost of Integrity's loans. From this, the Bureau began investigating Integrity and its loan practices.

### II. Procedural Background

#### A. The Bureau's Initial Investigation

**\*2** In January 2013, the Bureau sent Integrity a civil investigative demand ("CID") to obtain more information on Integrity's practices, its officers, and employees.[2] Included in this requested information were copies of Integrity's loan documents. Nine months later, in October 2013, Integrity produced its initial responses to the CID. It completed production in December 2013. In June 2014, the Bureau held an investigative hearing and took Carnes's testimony. During that hearing, Carnes described his role at Integrity and acknowledged that he had the ultimate say over all of Integrity's policies and procedures.

[2] CIDs work like civil subpoenas, and executive-branch departments or agencies commonly issue them in their investigations. The Bureau has statutory authority to issue CIDs under 12 U.S.C. § 5562(c)(1).

From its investigation, the Bureau concluded that Integrity's loan documents violated federal law. The Bureau learned that Integrity charged a fixed price of $30 for first-time customers for every hundred dollars borrowed per pay period. For repeat customers, Integrity charged $24 per hundred dollars per pay period. Though Integrity provided each borrower TILA disclosures, the disclosures misled borrowers into believing that they would pay off the loan with a single payment. But if a borrower didn't call Integrity three days before his or her next payment was due and request to pay the loan in full, the loan would automatically default into four cycles of "auto-renewal" status. Dkt. 308 at 5. If the borrower failed to act after four renewals, the loan would enter an "auto-workout" status. *Id.* This meant that Integrity would debit the consumer's personal banking account for a "finance charge[ ]" plus a "principal payment of $50.00" *Id.* at 4. The loan would remain in auto-workout status until it had been paid off. As an example, the Bureau tells us that "it could take a borrower many months to repay a $300 loan, and the loan would cost that borrower $1065 even though [Integrity]'s

TILA disclosures listed the total of payments as $390." Resp. Br. at 6.

The Bureau also learned that Integrity's loan documents required customers to provide direct automated-clearinghouse ("ACH") withdrawals from their bank accounts. If a customer tried to retract his or her ACH authorization, Integrity could remotely generate paper checks and withdraw payments directly from the customer's bank account.

On November 18, 2015, based on its gathered evidence, the Bureau filed a Notice of Charges against Petitioners. The Notice of Charges alleged that Integrity—as the loan provider—had violated TILA (Count I), EFTA (Count V), and CFPA (Counts II, III, IV, VI, and VII). The Bureau also alleged that Carnes had violated CFPA (Counts III, IV, and VII) given his knowledge of the misleading disclosures and his role as CEO.

**a. The First Administrative Hearing**

When the Bureau filed its Notice of Charges, the CFPB lacked an in-house ALJ. So the Bureau enlisted Parlen McKenna, an ALJ with the U.S. Coast Guard, to hear the case. In July 2016, ALJ McKenna held a three-day evidentiary hearing. The Bureau called six witnesses, and Petitioners called two. The parties also introduced documentary evidence. After considering all the evidence, ALJ McKenna ruled that the Bureau had proved all the active counts.[3] ALJ McKenna recommended that the Director order Petitioners to pay $38 million of restitution, jointly and severally, plus "first-tier"[4] civil penalties of $8.1 million from Integrity and $5.4 million from Carnes. Dkt. 176 at 74, 80–81.

[3] The Bureau had earlier stipulated to dismiss Count IV with prejudice before ALJ McKenna because it was duplicative of Count III. *See* Resp. Br. at 9–10 n.8 ("[T]he parties agreed that the consumer harm resulting from Count III was coextensive with Count IV."). This was because Count III alleged that Petitioners violated CFPA because Integrity's loan disclosures were *deceptive* and Count IV alleged that they violated CFPA because the loan disclosures were *unfair*. However, under the terms of the remand from the Director, the earlier dismissal of Count IV had no effect. Still, while the Director held that the Bureau properly pursued Count IV before ALJ Kirby, Count IV appears to make no difference to the ordered remedy. We assume it does not, because Petitioners make no argument explaining whether the revival of Count IV affects the resolution of the issues they raise on appeal.

[4] CFPA provides that "[a]ny person that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty[.]" 12 U.S.C. § 5565(c)(1). CFPA establishes three tiers of penalties with statutory maximums ranging from $5000 to $1 million (before adjustments for inflation) for each day during which a violation continues. "A first-tier penalty requires no showing of scienter; a second-tier penalty applies to 'any person that recklessly engages in a violation' of the CFPA; and a third-tier penalty applies to 'any person that knowingly violates' the CFPA." *See CFPB v. CashCall*, 35 F.4th 734, 741 (9th Cir. 2022) (citing 12 U.S.C. § 5565(c)(2)(A)–(C)).

**\*3** In 2016, Petitioners appealed the ALJ's decision to the Bureau's Director.[5] But the Director (and later the Bureau's Acting Director) held the appeal in abeyance pending the Supreme Court's decision in *Lucia v. SEC*, ––– U.S. ––––, 138 S. Ct. 2044, 201 L.Ed.2d 464 (2018). That case would soon decide the constitutional status of Securities & Exchange Commission administrative law judges.

[5] Parties may appeal an ALJ's recommendation to the Director under 12 C.F.R. § 1081.402(a)(1). Otherwise, the Director can accept or reject the recommendation under 12 C.F.R. § 1081.402(b).

In June 2018, the Supreme Court ruled that the SEC's ALJs were constitutional officers. That meant the Appointments Clause—U.S. Const. art. II, § 2, cl. 2—required that the ALJs be appointed by the President, a court of law, or a department head. *Lucia*, 138 S. Ct. at 2051, 2053–54. In May 2019, the Director concluded that *Lucia* required that ALJ McKenna be appointed under the Appointment Clause too. Because he hadn't been, the Director remanded the case to a constitutionally appointed ALJ for a "new hearing."

**b. The Second Administrative Hearing**

By the time the Supreme Court decided *Lucia*, the Bureau had obtained an in-house ALJ, Christine Kirby. She had been appointed in conformity with the Appointments Clause. In remanding Integrity's case to ALJ Kirby, the Director instructed her to "give no weight to, nor presume the correctness of, any prior opinions, orders, or rulings issued by" ALJ McKenna. Dkt. 308 at 8.

Though Petitioners requested a "new hearing" in which they could further develop the record, ALJ Kirby determined that ALJ McKenna had given the parties an adequate opportunity to present their case. Thus, she announced her "intent[ion] to conduct a *de novo* review of the record—to the extent possible." Dkt. 269 at 5. She clarified that she "w[ould] consider the parties' arguments as to whether the record need[ed] to be supplemented or whether portions of the record that were previously admitted should be struck." *Id.* But Petitioners wanted their proceedings before ALJ Kirby to include additional "pre-hearing discovery and an evidentiary hearing with the opportunity for both sides to present evidence and examine witnesses" beyond what they had presented before ALJ McKenna. Dkt. 295 at 12. Nevertheless, Petitioners (and the Bureau) each moved for summary disposition on the existing record.

In June 2020, while the summary-disposition motions were pending, the Supreme Court decided another case bearing on the Bureau's enforcement activities.[6] In *Seila Law LLC v. CFPB*, ––– U.S. ––––, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020), the Court reviewed a challenge to the Bureau's authority to issue a CID for documents from the law firm of Seila Law. *Id.* at 2194. The law firm had refused to comply with the CID, based on its assertion that the Bureau was unconstitutionally structured.[7] *Id.* Though the Bureau prevailed in the Ninth Circuit, the Supreme Court reversed. *Id.* at 2195–97. It held that Congress had structured the Bureau by making its director removable by the President only for "inefficiency, neglect, or malfeasance" in violation of the separation of powers. *Id.* at 2197; *see also* 12 U.S.C. § 5491(c)(3) ("The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office.").

[6] *Liu v. SEC*, ––– U.S. ––––, 140 S. Ct. 1936, 207 L.Ed.2d 401 (2020), is another important case decided a week before *Seila Law*. The case is relevant to Petitioners' challenge to the Director's ordered remedies. Though Petitioners preserved their arguments challenging the ordered remedies, they didn't cite *Liu* in their appeal before the Director. Nor did the Director discuss *Liu*. *See generally*, Dkt. 308.

[7] Throughout this opinion, our references to the Bureau's unconstitutional "structure" relate to Congress's having limited the President's authority to remove the Bureau's Director by requiring that the removal be for cause.

**\*4** By the time the Supreme Court heard the case, Congress had revised the Bureau's structure to authorize the President to remove the Bureau's Director without cause. *Id.* at 2208. And by then, the newly, properly appointed Director had ratified the previously issued CID.[8] *Id.* In this circumstance, the Court declared that the ratification issue "turn[ed] on case-specific factual and legal questions not addressed below and not briefed[.]" *Id.* Thus, it remanded the case for the Ninth Circuit "to consider whether the civil investigative demand was validly ratified." *Id.* at 2211.

[8] On remand, the Ninth Circuit held that the Director's ratification "remedies any constitutional injury that Seila Law may have suffered due to the manner in which the CFPB was originally structured." *CFPB v. Seila Law LLC*, 984 F.3d 715, 718 (9th Cir. 2020). That enabled the Bureau to enforce the disputed CID. *Id.* at 720.

In August 2020, ALJ Kirby recommended that Petitioners be held liable on all counts. She recommended that the Director hold Integrity responsible for $132.5 million in equitable restitution. Of this amount, she recommended that Carnes be held responsible for $38.4 million, jointly and severally. ALJ Kirby spared Carnes the $95.1 million difference for two reasons: (1) the Bureau hadn't charged him under all CFPA counts, and (2) the Bureau lacked statutory authority to enforce CFPA against Carnes until July 21, 2011, the date that the Bureau obtained its full range of authorities under CFPA. *See* Dkt. 308 at 26 n.8 (identifying the effective date of most of the Bureau's statutory authority as July 21, 2011).[9] She also recommended that the Director impose civil monetary penalties of $7.5 million against Integrity and $5 million against Carnes.

[9] In creating the Bureau, Congress afforded the agency time to implement its statutory functions. 75 Fed. Reg. 57252, 57252 (Sept. 20, 2010). Agencies previously enforcing consumer-protection laws needed to transfer their responsibilities to the Bureau. *Id.* Congress concluded that a "transfer date of July 21, 2011 ... will provide the CFPB an appropriate period of time to hire and assign employees to support its new functions, as well as to plan and make important decisions necessary to build a strong foundation for the new agency." *Id.* at 57253. On this "designated transfer date, the 'consumer financial protection functions' currently carried out by the Federal banking agencies, as well as certain authorities currently carried out by the Department of Housing and Urban Development and the Federal Trade Commission" were transferred to the Bureau. *Id.* (footnote omitted).

Petitioners appealed ALJ Kirby's recommendation to the Director. Petitioners contend that they "took exception to the Recommended Decision in its entirety, including but not limited to, all findings of liability, all relief recommended by the ALJ, and the ALJ's decision to deny [their] motion for Summary Disposition." Op. Br. at 9.

In January 2021, the Director adopted ALJ Kirby's recommendations on Petitioners' liability. The Director concluded that Integrity had violated TILA by using disclosures that misled borrowers into believing that their loans were single-payment loans, not multi-payment installment loans. The Director also determined that Integrity had violated EFTA by requiring consumers to accept the ACH authorization as a loan condition. The Director concluded that both Petitioners had violated CFPA (1) by providing deceptive loan disclosures, and (2) by using checks that Integrity created remotely, with the consumers' identifying information and without authorization, to withdraw their funds from their personal bank accounts if the ACH authorization failed.

**\*5** The Director mostly adopted ALJ Kirby's recommended restitution award and civil penalties. The Director reduced the restitution award against Integrity from $132.5 million to $38.4 million, the sum needed to compensate Petitioners' borrowers for harms suffered after July 21, 2011. The Director also imposed this restitution amount jointly and severally. But the Director departed from ALJ Kirby's characterization of the restitution award as an equitable, not legal, remedy.[10] Instead, the Director chose both, concluding that "[w]hether as a matter of *equity or law* ... an award of restitution is justified both to remedy the losses consumers suffered ... and to deprive Respondents of the amounts that they gained as a result of their unlawful conduct." Dkt. 308 at 35 (emphasis added). Finally, the Director agreed with ALJ Kirby's recommendation to impose civil penalties of $7.5 million from Integrity and $5 million from Carnes.

10  Addressing the Petitioners' request for legal, not equitable, restitution, ALJ Kirby noted that the Bureau "d[id] not cite to any authority or cases applying this theory in the context of a CFPB case and [Integrity and Carnes] argue that no such authority exists." Dkt. 293 at 79. ALJ Kirby was "not convinced that [the Bureau's] theory of 'legal' restitution is applicable to the present matter." *Id.* She concluded that she "need not decide this issue because ... an award of 'equitable' restitution is nevertheless appropriate." *Id.*

Acknowledging *Seila Law*, the Director ruled that in November 2015 (when the Notice of Charges was filed) the Bureau had been unconstitutionally structured because of the statutory limits on the President's removal authority. But the Director concluded that she could cure any associated problems by ratifying the Notice of Charges. Thus, the Director "ratif[ied] the Bureau's decision to file the Notice of Charges and to prosecute th[e] action." Dkt. 308 at 19.

Petitioners appeal the Director's final decision to our court.

### III. Standard of Review

"We review agency action under the Administrative Procedure Act." *Ukeiley v. EPA*, 896 F.3d 1158, 1163 (10th Cir. 2018). Our review requires us to determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1256 (10th Cir. 2019) (quoting 5 U.S.C. § 706(2)(a)(A)). We review purely legal questions de novo. *Karki v. Holder*, 715 F.3d 792, 800 (10th Cir. 2013). And we review factual findings for substantial evidence. *Forest Guardians v. U.S. Fish and Wildlife Serv.,* 611 F.3d 692, 704 (10th Cir. 2010). Evidentiary rulings and the agency's chosen remedies are reviewed for abuse of discretion. *United Steelworkers of Am. v. NLRB*, 376 F.2d 770, 773 (D.C. Cir. 1967); *Cintas Corp. v. NLRB*, 589 F.3d 905, 913 (8th Cir. 2009).

### DISCUSSION

Petitioners challenge the Director's final order on three primary grounds. *First*, they argue that we should set aside the Bureau's entire enforcement action because the Bureau was unconstitutionally structured when it filed its charges. *Second*, they argue that the enforcement action resulted in multiple due-process violations, chief among them being a deprivation of their right under *Lucia* to a "new hearing."[11] *Third*, they argue that the Director's restitution award is unlawful because it concerns an equitable remedy that must account for Petitioners' business expenses.

11  Petitioners also present a handful of arguments that pertain only to Carnes. We address these arguments in their own section of this opinion.

### I. The Bureau's Structure

Petitioners argue that an unconstitutionally structured agency lacks authority to act. And as mentioned, *Seila Law* held that in 2015 the Bureau was in fact unconstitutionally structured (as limiting the President's removal power) when it filed its Notice of Charges. From this, Petitioners conclude that the Bureau's enforcement action against them must be set aside entirely.

**\*6** In June 2021, after Petitioners filed their opening appellate brief, the Supreme Court rejected a similar argument in *Collins v. Yellen*, ––– U.S. ––––, 141 S. Ct. 1761, 210 L.Ed.2d 432 (2021). First, after concluding that *Seila Law* was "all but dispositive," the Court ruled that a "for cause" restriction on the President's ability to remove the Federal Housing Finance Agency ("FHFA") Director (a principal officer) violated separation of powers. *Id.* at 1783–84. Next, the Court considered whether that defect rendered the FHFA's prior actions void ab initio. *Id.* at 1787. The Court ruled that it did not, noting that the FHFA's leadership had been properly *appointed* when they took the disputed actions. *Id.* Because "there was no constitutional defect in the statutorily prescribed method of appointment of that office," the Court concluded that "there is no reason to regard any of the actions taken by the FHFA in relation to the [the disputed actions] as void."[12] *Id.*

[12]   Just two days before issuing *Collins*, the Court cautioned against any approach that would invalidate swaths of administrative decisions. *See generally United States v. Arthrex, Inc.*, ––– U.S. ––––, 141 S. Ct. 1970, 1986–88, 210 L.Ed.2d 268 (2021) (reaffirming the general principle that "when confronting a constitutional flaw in a statute, we try to limit the solution to the problem" (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006))).

In addition, *Collins* put to rest another of Petitioners' present arguments. In response to the argument that the agency's ratification of its earlier decisions wasn't timely, the Court in *Collins* ruled that an agency need not even ratify the actions it took while it was unconstitutionally structured. *Id*. at 1788. In reaching this conclusion, the Court rejected their claim that *Seila Law* said otherwise. *Id.* That resolves Petitioners' contention that the ratification here was impermissible for occurring after the three-year limitations period for filing the Notice of Charges had supposedly expired. *See* 12 U.S.C. § 5564(g)(1); *see also CashCall*, 35 F.4th at 742 ("We find it unnecessary to consider ratification because [*Collins v. Yellen*] has made clear that despite the unconstitutional limitation on the President's authority to remove the Bureau's Director, the Director's actions were valid when they were taken.").

Still, *Collins* left open an avenue of relief for potential injuries stemming from the actions of an unconstitutionally structured agency. On the issue of relief, the Court remanded "for further proceedings to determine what remedy, if any, the shareholders are entitled to receive on their constitutional claim." 141 S. Ct. at 1770. It observed that "the possibility that the unconstitutional restriction on the President's power to remove a Director of the FHFA could have such an effect cannot be ruled out." *Id.* at 1789. So the Court concluded that a future plaintiff may be able to challenge actions taken by an unconstitutionally structured agency by alleging "compensable harm." *Id.* As possible instances, the Court raised situations in which the President had wanted to remove the director but was stopped by a lower court decision or by heeding a statute disallowing it. *Id.* Petitioners in our case don't point to any such "compensable harm" resulting from the Bureau's unconstitutional structure. We therefore find no avenue of relief available to them under *Collins*.

We heed *Seila Law*'s admonition that we are to use a "scalpel rather than a bulldozer" in remedying a constitutional defect. *See Seila Law*, 140 S. Ct. at 2210–11. So, because the Director's actions weren't unconstitutional, we reject Petitioners' argument to set aside the Bureau's enforcement action in its entirety.

**II. Petitioners' Due-Process Claims**
Petitioners next complain of what they characterize as due-process violations. They argue that ALJ Kirby's proceeding fell short of the "new hearing" referenced in *Lucia*. They also challenge some of the ALJ's evidentiary rulings. We address these arguments in turn.

**A. A "New Hearing" Under *Lucia v. SEC***
**\*7** In *Lucia*, the Supreme Court provided a remedy for the Appointments Clause violation, namely, a "new hearing" before a constitutionally appointed ALJ. 138 S. Ct. at 2055. Petitioners argue that a "new hearing" must allow additional evidence and arguments—it can't just be a de novo review of the existing record. Unfortunately, *Lucia* offers little guidance on the constitutional requirements of a "new hearing." In fact, it simply cites *Ryder v. United States*, 515 U.S. 177, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995), for the proposition that a new hearing is required. *See Lucia*, 138 S. Ct. at 2055. But *Ryder*

doesn't help us much either, as it simply requires "a hearing before a properly appointed panel" of military court judges. 515 U.S. at 188, 115 S.Ct. 2031.

We do find helpful a D.C. Circuit case applying *Ryder* and rejecting an argument that a "new hearing" must be more than de novo review by a different ALJ. In *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 796 F.3d 111 (D.C. Cir. 2015), the court noted that appellant's sole support for re-opening an administrative proceeding on remand was "a single sentence at the end of the [*Ryder*] opinion," but "[n]othing in that sentence suggests that a new hearing would have been required if the reviewing court had possessed de novo authority." *Id.* at 120.

Petitioners have provided no support for a bright-line rule against de novo review of a previous administrative hearing. Nor do we see a reason for a more extensive hearing. The Appointments Clause violation notwithstanding, Petitioners had a full opportunity to present their case in the first proceeding. ALJ Kirby independently reviewed the existing record before relying on it. And she permitted Petitioners to challenge ALJ McKenna's previous determinations. Ultimately, she agreed with most of ALJ McKenna's recommendations and rejected Petitioners' various challenges. We see no error.

### B. Evidentiary Rulings

Petitioners raise a handful of evidentiary challenges to the Bureau's decision. They argue that ALJ Kirby erred by not permitting evidence about Integrity's operational expenses,[13] about their reliance on counsel, and about the credibility of certain witnesses.[14] Petitioners must show that the Bureau abused its discretion by excluding this evidence. *See Manna Pro Partners, L.P. v. NLRB*, 986 F.2d 1346, 1353 (10th Cir. 1993).

---

[13] We address Petitioners' argument to present evidence of their expenses in Section III of this opinion discussing the Supreme Court's decision in *Liu v. SEC*.

[14] Petitioners also argue that it was legal error for ALJ Kirby to deny their motion to amend their answer to challenge as vague the Bureau's characterization of their practices as unfair, deceptive, or as abusive acts or practices ("UDAAP"). A UDAAP results in the violation of the CFPA. *See* 12 U.S.C. § 5531(a). Petitioners make no effort to brief this argument or explain why it was legal error for ALJ Kirby to deny their request. So we

decline to consider it. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998).

Petitioners' position lacks support, as they cite no case reversing based on similar alleged error. And even without deferential review, Petitioners' arguments would still fail. Petitioners argue that ALJ Kirby prevented them from presenting their advice-of-counsel defense. They say that this defense would have negated the restitution award and civil penalties. In support, they assert that Carnes "did not draft, revise, or substantively review or approve the Loan Agreement, but instead relied on [his] legal counsel." Op. Br. at 4, 35–36. But we don't see where ALJ Kirby prevented Carnes from presenting his defense—she just ruled that Carnes's testimony sufficed on this point. *See* Dkt. 269 at 9 ("Respondents state in their brief that Respondent Carnes previously testified that he relied upon his outside counsel to draft the loan agreement and to ensure it complied with the law .... Additional testimony ... appears unnecessary and, at best, would merely corroborate Carnes' sworn testimony.").

**\*8** Further, Petitioners' asserted advice-of-counsel defense isn't relevant to the restitution award. Petitioners' contrary argument relies on two district court cases. But the Ninth Circuit has reversed one of their cases on grounds that reliance on counsel is neither an appropriate basis to deny CFPA liability nor to deny restitution. *See CashCall, Inc.*, 35 F.4th at 749. Nor is advice of counsel relevant to the appropriateness of civil penalties under 12 U.S.C. § 5565, unless "heightened" civil penalties are imposed. *See id.* at 750. Petitioners weren't subject to heightened civil penalties.

Petitioners also challenge ALJ Kirby's decision to forgo live testimony despite its help in evaluating the credibility of witnesses. But nothing requires an ALJ to "observe a witness'[s] live testimony," and Integrity never "articulated sufficient grounds for [ALJ Kirby] to recall any of the witnesses for this purpose." *See* Dkt. 269 at 7. So we find no abuse of discretion.

### III. Carnes's Due-Process Claims

Carnes alleges three due-process violations pertaining solely to himself: (1) CFPA's statute of limitations had expired before the November 2015 Notice of Charges; (2) the Director wrongly upheld ALJ Kirby's denial of Carnes's discovery request seeking information relating to the statute of limitations; and (3) that ALJ Kirby granted summary disposition over Carnes's liability despite the existence of genuine factual disputes.[15] These arguments lack merit.

15    The statute-of-limitations arguments apply to Carnes alone, because the Bureau signed tolling agreements with Integrity to toll the limitations period.

### A. Statute of Limitations

Petitioners argue that the Notice of Charges was filed outside the limitations period because the Bureau either did discover or could have discovered Carnes's violations more than three years before it filed its Notice of Charges. Under CFPA, "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). We conclude that § 5564(g)(1)'s limitations period commences when the Bureau either knows of a violation or, through reasonable diligence, would have discovered the violation.

In *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010), the Court considered "the timeliness of a complaint filed in a private securities fraud action." *Id.* at 637, 130 S.Ct. 1784. The Court noted that "[t]he complaint was timely if filed no more than two years after the plaintiffs 'discover[ed] the facts constituting the violation.' " *Id.* (quoting 28 U.S.C. § 1658(b)(1)). The Court held that a claim for relief "accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first." *Id.* The Court further held that "the 'facts constituting the violation' include the fact of scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Id.* (citation omitted).

A fraud claim accrues "once a plaintiff has a 'complete and present cause of action.' " *Id.* at 644, 130 S.Ct. 1784 (citation omitted). Otherwise, "a defendant's deceptive conduct may prevent a plaintiff from even *knowing* that he or she has been defrauded." *Id.* Thus, in considering accrual, we are mindful of the Court's pronouncement that "unless a § 10(b) plaintiff can set forth facts in the complaint showing that it is 'at least as likely as' not that the defendant acted with the relevant knowledge or intent, the claim will fail." *Id.* at 649, 130 S.Ct. 1784 (citation omitted). Accrual and knowledge go together.

**\*9** Importantly, the Court rejected Merck's argument that "facts that tend to show a materially false or misleading statement (or material omission) are ordinarily sufficient to show scienter as well." *Id.* As support, the Court noted that "[a]n incorrect prediction about a firm's future earnings, by itself, does not automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error." *Id.* at 650, 130 S.Ct. 1784.

The Court also rejected Merck's argument that the limitations period accrued when a plaintiff is on "inquiry notice," meaning "the point 'at which a plaintiff possesses a quantum of information sufficiently suggestive of wrongdoing that he should conduct a further inquiry.' " *Id.* (citation omitted). The Court saw nothing in the statutory limitations period signifying "that the limitations period should occur at some earlier moment before 'discovery,' when a plaintiff would have *begun* investigating[.]" *Id.* at 651, 130 S.Ct. 1784.

Petitioners' statute-of-limitations arguments fail just as Merck's did. Petitioners make a debatable argument that by May 18, 2012, the Bureau could have learned from public information that Carnes was Integrity's CEO. But the limitations period still wouldn't have run by November 18, 2015, when the Bureau filed its Notice of Charges. Before the limitations period would commence, the Bureau needed to know not only that Carnes was Integrity's CEO but also that *he had sufficient knowledge of those violations*. See *CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016). As discussed further below, the Bureau couldn't successfully charge Carnes personally without showing that he "had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation[s], or was aware of a high probability of fraud along with an intentional avoidance of the truth." *Id.* After all, "scienter is assuredly a fact" that the Bureau would need to prove. *Merck*, 559 U.S. at 648, 130 S.Ct. 1784 (cleaned up). We reject the argument that the receipt of consumer complaints triggered the statute of limitations. As *Merck* says, consumer complaints generally serve only as a "storm warning" that an agency might want to start investigating. 559 U.S. at 653, 130 S.Ct. 1784.

Here, the limitations period wouldn't have commenced earlier than October 2013, when the Bureau received Integrity's responses to the CIDs and deposed Carnes. Carnes hasn't identified what public information would have established his knowledge of Integrity's illegal conduct before then. Petitioners didn't provide the information about Carnes's role and knowledge until late 2013. So the Bureau's November 2015 Notice of Charges is timely.

### B. Discovery Requests

Petitioners argue that the ALJ violated their due-process rights by denying Carnes additional discovery on the statute-of-limitations issue. They conclude that "[t]he

Director's denial was an abuse of discretion and, under the circumstances, a denial of Petitioners' due process rights." *See* Op. Br. at 31. But Petitioners cite no authority supporting their view that the ALJ abused her discretion. And the Bureau couldn't have learned of Petitioners' violations until they complied with the Bureau's CID, so additional discovery would have been pointless. Our conclusion might have been different had Petitioners pointed us to public documents that, for example, evinced Carnes's knowledge of Integrity's misleading practices. But, based on the record before us, we reject Petitioners' argument.

**\*10** What's more, the Bureau complied with Petitioners' valid discovery requests. It produced the consumer complaints and related external communications about Petitioners. Though Petitioners argue that they should have received the Bureau's "internal correspondence" too, Op. Br. at 31, the ALJ didn't err by denying their request. Under 12 C.F.R. § 1081.206(b)(1)(ii), "[t]he Office of Enforcement may withhold a document if: ... The document is an internal memorandum, note, or writing prepared by a person employed by the Bureau[.]" Nonetheless, Carnes complains that he never received a privilege log for any withheld documents. But the ALJ needn't order a privilege log. *See* 12 C.F.R. § 1081.206(c) ("The hearing officer *may* require the Office of Enforcement to produce a list of documents or categories of documents withheld[.]") (emphasis added).

### C. Summary Disposition

Petitioners argue that the Director erred by ruling on summary disposition that Carnes acted with knowledge of Integrity's illegal practices.

Under CFPA, an individual may be held liable for a corporation's violations if "(1) he participated directly in the deceptive acts *or* had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation[s], or was aware of a high probability of fraud along with an intentional avoidance of the truth." *Gordon*, 819 F.3d at 1193 (citation omitted).[16]

16     In *Gordon*, the Ninth Circuit adopted the test for individual liability for a corporation's actions used under the FTC Act. 819 F.3d at 1193 n.8. Petitioners don't object to importing the Ninth Circuit's test for individual liability from *Gordon*. And the parties all cite *Gordon* in their briefing. We thus follow the Ninth Circuit's articulation of the relevant test in *Gordon*. We note that other courts have similarly relied on the FTC Act to interpret CFPA. *See, e.g.*, *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at \*17 (S.D.N.Y. Dec. 2, 2016).

Petitioners don't challenge the finding that Carnes controlled Integrity—the first requirement under *Gordon*. They challenge only the Director's finding under the second requirement of *Gordon* about knowledge. We note that the Director found that Carnes knew about Integrity's misrepresentations and, alternatively, found that Carnes was at least recklessly indifferent to the misrepresentations. *See* Dkt. 308 at 15 ("[T]here is ample evidence that Mr. Carnes knew that [Integrity]'s loan agreement misrepresented the amount that consumers were likely to pay, and also knew that consumers were likely to pay more than the amount disclosed unless they took affirmative action."); *see also id.* at 16 ("While Mr. Carnes asserts that as CEO he was not familiar with the details of [Integrity]'s loan agreement, I conclude that he was at least recklessly indifferent to those details[.]"). Yet, Petitioners' opening brief mentions the words "recklessly" and "indifferent" only when stating the legal standard. *See* Op. Br. at 25, 33. Petitioners' brief provides no basis for why the Director's finding of reckless indifference would be erroneous. *See Bronson v. Swensen*, 500 F.3d 1099, 1104–05 (10th Cir. 2007) (parties must adequately brief the arguments they want our court to consider). So we hold that the Director's order properly found Carnes liable for being recklessly indifferent to Integrity's practices.

Nevertheless, the Director didn't err in also finding that Carnes knew about Integrity's misrepresentations. Petitioners argue that Carnes's reliance on counsel precludes a finding that Carnes was sufficiently knowledgeable. They contend that the Director improperly "disregard[ed] other evidence that Mr. Carnes did not substantively approve the loan agreement and instead relied on outside counsel." Op. Br. at 34. But reliance on counsel isn't a defense to liability. *See CashCall*, 35 F.4th at 749 (Under CFPA, individual liability requires knowledge of the practices that misled consumers, not knowledge that the misleading practices were illegal). Addressing Carnes's review and approval of the loans, the Director had a solid basis to find that "[a]lthough Mr. Carnes did not personally draft the loan agreement that [Integrity] used for those loans, he approved its use." Dkt. 308 at 14; *see also id.* (Carnes testified: "Did they have my approval to use the loan agreement? Yes."); *id.* ("Q. And in most cases they would pay substantially more than the amount that's reflected

in the total amounts of payments box; is that right? A. They would pay more.").[17]

[17] Petitioners contest the illegality of Integrity's practice of using remotely created checks to withdraw funds from customer accounts. We agree with the Director that Petitioners' practice was "unfair" under CFPA.

**\*11** In short, we find the Director's analysis consistent with the applicable standard in *Gordon*. We therefore reject Petitioners' arguments.[18]

[18] In support of their argument that Carnes didn't know that Integrity's loans were misleading, Petitioners rely on the State of Delaware's approval of their application to do business there. But this didn't include a legal review of the loan document under federal law.

## IV. Remedies Order

Petitioners challenge the remedies order on the basis that the ALJ and Director didn't allow them to present evidence of their good-faith reliance on counsel (as to restitution and civil penalties) and evidence of their expenses (as to the Director's residual disgorgement order). We reject Petitioners' challenges.

### A. Evidence of Good Faith

Petitioners argue that the ALJ erred by disallowing evidence of their good faith through their advice-of-counsel defense. They contend that the Director should have denied restitution or civil penalties based on this evidence. As earlier discussed in Section II.B. of this opinion, Petitioners' advice-of-counsel argument opposing restitution lacks merit. As "developing case law," they cite two district-court decisions from the Ninth Circuit concluding that advice of counsel is relevant to restitution. But since Petitioners' briefing, the Ninth Circuit has ruled otherwise. *See CashCall*, 35 F.4th at 750–51 (finding that reliance on counsel is not an appropriate basis for denying restitution.).

As for the civil penalties under CFPA, the Director must consider five possible mitigating factors before imposing a civil-penalty order. *See* 12 U.S.C. § 5565(c)(3). The Director considered all these factors, including good faith, and rejected Petitioners' challenge to the ALJ's recommended civil penalties. As earlier discussed, the ALJ considered Carnes's own testimony on this point and deemed that sufficient. *See* Section III.C., *supra*. This is all that was required.[19]

[19] Further, Petitioners repeatedly asserted attorney-client privilege in responding to discovery requests, which hindered the Bureau's ability to contest any advice-of-counsel evidence. Petitioners don't dispute this fact.

### B. Net Profits and Business Expenses

Petitioners complain that the ALJ kept them from introducing evidence of Integrity's legitimate business expenses. In their opening brief, Petitioners claim an offset for these expenses for any "disgorgement," but not an offset against the restitution award itself. Op. Br. at 39. They acknowledge that "[t]hroughout the proceedings, the CFPB sought restitution rather than disgorgement." *Id.* After that, they note that the Director further ordered that "the Bureau will deposit any remaining funds in the U.S. Treasury as disgorgement" after restitution amounts are transferred to individual consumers. Dkt. 309 at 1.

Because the Director referred to a "disgorgement" remedy, Petitioners seek an offset for expenses on disgorged amounts under *Liu v. SEC*. In that case, the Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [28 U.S.C.] § 78u(d)(5)." 140 S. Ct. at 1940. The Court further ruled that "courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." *Id.* at 1950. But the present case differs from *Liu*.

**\*12** Here, the Director ordered the full $38.4 million as both legal and equitable restitution. Petitioners haven't challenged that designation and have thus waived any challenge. So we evaluate the case as one involving a legal, not equitable, remedy. Under § 5565, the Bureau has jurisdiction in "[a]dministrative proceedings or court actions" "to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law." 12 U.S.C. § 5565(a)(1). Among the listed available remedies is "restitution." *Id.* at § 5565(a)(2)(C).

In contrast, *Liu* involved a disgorgement order under a statute allowing only equitable relief. Certainly, the Director in Petitioners' case did describe as "disgorgement" any possible sums deposited in the U.S. Treasury for borrowers the Bureau couldn't locate to reimburse. *See* Dkt. 309 at 1 ("If funds remain after this redress has been completed, the

Bureau will deposit any remaining funds in the U.S. Treasury as disgorgement."). But Petitioners offer no authority that such deposits to the U.S. Treasury become equitable disgorgement. In fact, in *Liu*, the Court declared it an "open question" whether such deposits are "consistent with the limitations of § 78u(d)(5)." *Id.* at 1948. The Court noted that "[t]he parties have not identified authorities revealing what traditional equitable principles govern when, for instance, the wrongdoer's profits cannot practically be disbursed to the victims." *Id.* at 1948–49. Left in this same circumstance, we cannot conclude that Petitioners are entitled to an offset for legitimate business expenses against any future, hypothetical funds collected as legal restitution, but by the Director's order deposited with the U.S. Treasury as disgorgement.[20] Moreover, *Liu* concerned the SEC's authority to order disgorgement under 15 U.S.C. § 78u(d)(5). That statute limits the SEC to granting "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). But 12 U.S.C. § 5565(a) is broader, permitting the Bureau to pursue both equitable and legal relief.

[20] In their reply brief, Petitioners enlarge their argument to assert that the Director "ordered that the entire award be retained by the government as 'disgorgement,' in essence, turning the remedy into a disgorgement award." Reply Br. at 18 (citing Dkt. 309 at 1). In addition to asserting a new argument in the reply brief, Petitioners mischaracterize the record as cited, which does not support their account of it.

Finally, Petitioners contest the Director's imposition of joint and several liability for restitution or disgorgement "without consideration or evidence of what (if any) profits of the alleged misconduct went to Mr. Carnes individually." Op. Br. at 39–40. The Bureau responds that Petitioners have waived this argument by failing to object to its request for joint and several liability in moving for summary disposition before ALJ Kirby or on appeal before the Director. Petitioners reply that the possibility of disgorgement never arose until the Director issued her order, so they couldn't have objected to its joint and several nature. Even so, Petitioners could have objected to joint and several liability for the full restitution award of $38.4 million. In that circumstance, we conclude that Petitioners have waived this issue too.[21]

[21] We note that in *Liu*, the Court addressed an argument against imposing joint and several liability. 140 S. Ct. at 1947, 1949. The Court pointed to "the common-law rule requiring individual liability for wrongful profits,"

and commented that the SEC's joint and several liability "could transform any equitable profits-focused remedy into a penalty." *Id.* at 1949. But the Court further noted that "[t]he common law did, however, permit liability for partners engaged in concerted wrongdoing." *Id.* The Court didn't reverse the joint and several liability. Instead, it noted that the petitioners, a married couple, had presented no evidence that they did not both "enjoy the fruits of the scheme." *Id.* Here, Integrity and Carnes obviously were closely related, and as in *Liu*, we see nothing making joint and several liability "unjust." *See id.*

**CONCLUSION**

**\*13** The Director's order is affirmed.

PHILLIPS, Circuit Judge, concurring.

In contesting the Director's restitution award, Petitioners don't challenge the Director's approval of restitution as a legal (as well as an equitable) remedy. Though I agree that Petitioners have waived any such challenge on this point, I express some reservations about legal restitution under § 5565(a) for a case in which the issue is preserved.

Under 12 U.S.C. § 5565, the Bureau may sue either in federal district court or in its own administrative tribunal to seek "appropriate legal or equitable relief":

(a) Administrative proceedings or court actions

(1) Jurisdiction[—]The court (or the Bureau, as the case may be) in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant *any appropriate legal or equitable relief* with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law.

12 U.S.C. § 5565(a)(1) (emphasis added). In my view, whether this statute allows a given remedy depends on the forum and the nature of the remedy sought. I have three reasons for questioning whether "legal restitution" is an appropriate form of relief, especially when the Bureau chooses to litigate in its own administrative tribunal.

First, restitution is generally considered to be an equitable remedy. *See Adams v. Cyprus Amax Minerals Co.*, 149 F.3d 1156, 1162 (10th Cir. 1998); *see also CFPB v. Consumer First Legal Grp., LLC*, 6 F.4th 694, 711 (7th Cir. 2021) (rejecting

the Bureau's attempt to recharacterize an award of equitable restitution under 12 U.S.C. § 5565 as legal restitution). When Congress refers to a remedy that is traditionally equitable, courts presume that the remedy maintains its equitable character. *See Liu*, 140 S. Ct. at 1947 ("Statutory references to a remedy grounded in equity must, absent other indication, be deemed to contain the limitations upon its availability that equity typically imposes. Accordingly, Congress' own use of the term 'disgorgement' in assorted statutes did not expand the contours of that term beyond a defendant's net profits—a limit established by longstanding principles of equity." (cleaned up)). Nothing in § 5565 empowers the Bureau to treat the listed remedies under § 5565(a)(2) as legal or equitable for its convenience.

Second, the Bureau's claim to "legal restitution" might render superfluous another remedy listed in § 5565(a)(2). *See Lockheed Martin Corp. v. Admin. Rev. Bd.*, 717 F.3d 1121, 1130 (10th Cir. 2013) ("It is a rudimentary canon of statutory construction that such superfluities are to be avoided."). I am uncertain how the Bureau's "legal restitution" differs from "payment of damages or other monetary relief," which is separately listed in § 5565(a)(2)(E).

Third, allowing the Bureau to obtain "legal restitution" in an administrative forum raises Seventh Amendment concerns, which implicates the constitutional-avoidance canon. The Seventh Amendment guarantees jury-trial rights to parties sued for legal remedies. *See Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 992 n.14 (10th Cir. 2019) ("Though the Seventh Amendment guarantees the right to a jury trial in any suit involving legal rights, this guarantee doesn't extend to equitable rights." (cleaned up)); *see also Lorillard v. Pons*, 434 U.S. 575, 583, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("In cases in which legal relief is available and legal rights are determined, the Seventh Amendment provides a right to jury trial." (citation omitted)); *Jarkesy v. SEC*, 34 F.4th 446, 454 (5th Cir. 2022) (the Seventh Amendment applies to actions seeking legal relief) (citing *Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987)). Under the constitutional-avoidance canon, courts interpret federal statutes to avoid risking constitutional concerns. *See United States v. Ciapponi*, 77 F.3d 1247, 1250 (10th Cir. 1996); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 247–48 (2012) (explaining that the "constitutional-doubt canon "militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality."). Interpreting § 5565(a)(2) to encompass "legal restitution" would enable the Bureau to file actions for legal relief in its own administrative tribunals potentially in violation of the Seventh Amendment.

**\*14** Had Petitioners not waived their challenge to legal restitution, I would reach the issue of whether § 5565 permits legal restitution in an administrative enforcement action. If it doesn't, and only equitable restitution is permitted, I would require an explanation why, under *Liu*, the Bureau's administrative restitution order wouldn't need to be reduced by Integrity's legitimate business expenses.

**All Citations**

--- F.4th ----, 2022 WL 4241846

---

End of Document     © 2022 Thomson Reuters. No claim to original U.S. Government Works.